**LITHUANIAN COMMERCE CORPORATION, LTD.,**
**Plaintiff,**

v.

**SARA LEE HOSIERY, Sara Lee Hosiery International, Sara Lee International and Sara Lee Corporation, Defendants,**

v.

**Algis VASYS and Laima Zajanck-auskiene, Additional Counter-claim Defendants.**

**Civil Action No. 96–1949.**

United States District Court,
D. New Jersey.

Oct. 21, 1998.

510

Gregory D. Saputelli, James R. Thompson, James T. Asali, Kimberly D. Sutton, Obermayer, Rebmann, Maxwell & Hippel, Haddonfield, NJ, for Lithuanian Commerce Corp. Ltd., Algis Vasys, Laima Zajanckauskiene.

Neil C. Schur, Ballard, Spahr, Andrews & Ingersoll, LLP, Camden, NJ, Carl W. Hittinger, Lance D. Lewis, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA, for Sara Lee Hosiery, Sara Lee Hosiery International, Sara Lee International, Sara Lee Corp.

## OPINION

ORLOFSKY, District Judge.

After eighteen days of trial, during which Plaintiff and Counterclaim Defendant, Lithuanian Commerce Corp., and Additional Counterclaim Defendants, Algis Vasys and Laima Zajanckauskiene (collectively, "LCC"), presented twelve witnesses and more than 200 exhibits to the jury, Defendants and Counterclaim Plaintiffs, Sara Lee Hosiery, Sara Lee Hosiery International, Sara Lee International, and Sara Lee Corporation (collectively, "Sara Lee"), have moved for judgment as a matter of law on all of LCC's claims, pursuant to Federal Rule of Civil Procedure 50(a).[1] This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, based on diversity of citizenship and the requisite amount in controversy.

This case involves a bitter and acrimonious dispute over the sale and distribution of L'eggs pantyhose in Lithuania. LCC had served as the exclusive Lithuanian distributor of L'eggs pantyhose for Sara Lee, the manufacturer of L'eggs pantyhose. LCC alleges that while it was Sara Lee's exclusive Lithuanian distributor, Sara Lee donated a large number of pantyhose to areas neighboring Lithuania, which created a black market for pantyhose in Lithuania and, allegedly, hampered LCC's sales of L'eggs pantyhose. After LCC complained about Sara Lee's so-called "dumping" of pantyhose in the Baltic, the two parties reached a settlement in which Sara Lee provided LCC with a large number of Mexican-made pantyhose at no cost. Vasys, on behalf of LCC, and Vereen Mizelle, on behalf of Sara Lee, signed a letter agreement, which released "Sara Lee Hosiery and any affiliated company, successor, assignee, officer, director, employee, or agent from any claim, demand, or cause of action LCC [might have had or] may have ... in the future growing out of any matter or dispute whatsoever related to any act or event occurring up to or through the date of this letter." Pl.'s Ex. 99 (Letter from Vereen Mizelle, Assistant Marketing Manager for Sara Lee, to Algis Vasys, President of LCC, dated July 7, 1995). In exchange for this release, Sara

---

1. Federal Rule of Civil Procedure 50(a) provides: (1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for a judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.
 (2) Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

Lee agreed to provide LCC with 34,835 dozens of L'eggs pantyhose manufactured by Manufacturas Mallorca de Mexico, at no charge other than shipping expenses. *See id.* LCC alleges that the Mexican pantyhose Sara Lee provided pursuant to this Letter Agreement were defective, or, at the very least, significantly different from the American versions of the L'eggs styles of pantyhose LCC had previously received from Sara Lee. LCC contends that, as a result of the poor quality of these Mexican-made pantyhose, LCC's business suffered both in terms of lost profits that it should have realized had the pantyhose been of standard quality, and in the goodwill that LCC lost with its customers.

In response, Sara Lee claims that LCC examined samples of the pantyhose and, therefore, LCC had full knowledge of the nature and quality of the Mexican-made pantyhose. Further, Sara Lee has asserted counterclaims, which allege that LCC and its principals, Algis Vasys and Laima Zajanckauskiene, made false claims in their advertisements for L'eggs pantyhose by claiming that L'eggs pantyhose have medicinal and therapeutic value, and that LCC failed to pay invoices due to Sara Lee.

During the eighteen-day trial of LCC's case, the jury heard the live or videotaped deposition testimony of twelve witnesses, including Vasys, President of LCC, Zajanckauskiene, the Vice–President of LCC, and Vereen Mizelle, who at the time worked for Sara Lee covering LCC's territory. LCC also introduced into evidence over 200 exhibits.

At the close of LCC's case, Sara Lee moved for judgment as a matter of law on the grounds that: (1) LCC failed to prove that it sustained compensatory damages as a result of Sara Lee's alleged breach of express warranty, breach of implied warranties of merchantability and fitness for a particular purpose, breach of contract, commission of common law fraud, tortious interference with LCC's business, and violation of the duty of good faith and fair dealing; (2) LCC did not present sufficient proof that it was a franchisee of Sara Lee, to support LCC's claim alleging a violation of the New Jersey Franchise Practices Act, N.J. Stat. Ann. § 56:10–1 *et seq.;* (3) LCC failed to prove at least one of the essential elements of its tortious interference claim; (4) LCC did not present the jury with sufficient evidence to permit a finding of fraud; and (5) LCC did not present sufficient evidence to enable the jury to award punitive damages.

For the reasons set forth below, Sara Lee's motion for judgment as a matter of law will be granted. I find that LCC has not presented sufficient evidence regarding lost profits to permit the jury to award compensatory damages without engaging in pure speculation. Accordingly, Sara Lee's motion will be granted on LCC's claims for compensatory damages resulting from breach of express warranty, breach of implied warranties of merchantability and fitness for a particular purpose, breach of contract, common law fraud, tortious interference, and a violation of the duty of good faith and fair dealing. Further, I find that LCC failed to prove one of the elements necessary to sustain a finding that LCC is a franchisee of Sara Lee, and, therefore, I will grant Sara Lee's motion for judgment as a matter of law on LCC's claims under the New Jersey Franchise Practices Act. Additionally, I find that under the New Jersey Punitive Damages Act, N.J. Stat. Ann. § 2A:15–5.13.c. (West Supp.1998), LCC cannot recover punitive damages without first recovering compensatory damages. Because I conclude that LCC has not presented sufficient evidence to permit a finding of compensatory damages, it cannot recover punitive damages as a matter of law and, consequently, I also will grant Sara Lee's Rule 50 motion on LCC's punitive damages claim.

## I. Factual and Procedural Background

I have previously set forth the factual and procedural history of this case at length in my opinion of June 29, 1998, *see Lithuanian Commerce Corp. v. Sara Lee,* 179 F.R.D. 450, 455–56, 465–68 (D.N.J.1998), and, therefore, I will not repeat it here. I will, however, summarize some of the more salient events in the tortuous procedural history of this case and update this history in light of the trial record, which the parties have developed.

LCC filed this action on April 29, 1996, claiming, *inter alia,* that Sara Lee violated

numerous of its contractual obligations, the New Jersey Consumer Fraud Act, the New Jersey Franchise Practices Act, and the Lanham Act. *See* Complaint, filed Apr. 29, 1996; *see also* Amended Complaint, filed Apr. 15, 1997. LCC also alleged that Sara Lee had committed tortious interference and common law fraud. *See id.* Sara Lee denied these allegations, *see* Answer, filed April 23, 1997, and filed counterclaims, which alleged that LCC had failed to pay various invoices. *See* Counterclaim, filed Apr. 14, 1997. Sara Lee also asserted that LCC and its principals, Vasys and Zajanckauskiene, had made false claims in their advertisements for L'eggs pantyhose by suggesting that L'eggs had therapeutic and medicinal value for the treatment of varicose veins. *See id.;* Third–Party Complaint, filed Apr. 14, 1997.

On October 1, 1997, Sara Lee filed a motion *in limine* to exclude the testimony of six of LCC's expert witnesses. In particular, Sara Lee argued to United States Magistrate Judge, Joel B. Rosen, that LCC's expert on damages, Charles Cummiskey, should be excluded because his analysis was unreliable and speculative. *See Lithuanian Commerce Corp.,* 179 F.R.D. at 458. Judge Rosen denied Sara Lee's motion with respect to Cummiskey, entering his opinion on December 4, 1997. *See Lithuanian Commerce Corp. v. Sara Lee,* 177 F.R.D. 245, 256–59 (D.N.J. 1997). Sara Lee appealed from this portion of Judge Rosen's decision and I considered the issue in my opinion of June 29, 1998. *See Lithuanian Commerce Corp.,* 179 F.R.D. at 458–62.

In my June 29, 1998, opinion, I vacated Magistrate Judge Rosen's earlier opinion and held that Cummiskey's "analysis lacks the reliability required by *Daubert* and the reliability required by the Federal Rules of Evidence." *See id.* at 458. In particular, I determined that a "close examination of Cummiskey's opinion reveal[ed] its inadequate foundation, and I therefore [found] that Cummiskey's testimony with respect to the predicted length of damages is unreliable

and inadmissible." *Id.* at 460. Accordingly, I granted Sara Lee's motion to exclude Cummiskey's testimony.[2]

Despite the exclusion of the testimony of its only expert witness on damages, LCC failed to move to amend the Joint Final Pretrial Order to include such an expert, nor did LCC make any attempt to do so at trial. At no time did LCC seek to amend the Joint Final Pretrial Order to add a new witness, a new expert, or new documents with respect to its claims for lost profits. *See* Transcript of Oct. 5, 1998 ("10/5/98 Tr."),[3] at 1399, 1405.

Instead, LCC attempted to "transform" one of its fact witnesses, Laima Zajanckauskiene, the Vice–President of LCC and one of the Additional Counterclaim Defendants, into an expert on damages. While Ms. Zajanckauskiene was on the witness stand during her direct examination, counsel for LCC petitioned this Court to amend, or to ignore, the description of Ms. Zajanckauskiene's testimony set forth in the Joint Final Pretrial Order. *See* 9/23/98 Tr. at 938–39. The description of Ms. Zajanckauskiene's testimony contained in the Joint Final Pretrial Order provided: "Ms. Zajanckauskiene will testify concerning her ... belie[f] that Sara Lee misrepresented the quality of the Mexican pantyhose and LCC lost business as a result." Joint Final Pretrial Order at 93–94. By contrast, on September 23, 1998, LCC's counsel stated that Ms. Zajanckauskiene would "testify as to the projections that she made as to the amount of stores that [LCC was] projecting to have at different points in time." 9/23/98 Tr. at 938. In response to the request of Sara Lee's counsel to exclude this testimony, I ruled from the bench that the description of Ms. Zajanckauskiene's testimony in the Joint Final Pretrial Order was:

> different than making damage projections. I'll let her testify with respect to her understanding of the misrepresentation of the quality of the pantyhose, and that in her view that as a result of that they lost business. I'll let her testify as to that, but

---

**2.** In my June 29, 1998, opinion, I also granted Sara Lee's motion for summary judgment on LCC's claims of: (1) a violation of the New Jersey Consumer Fraud Act; (2) negligent misrepresentation; (3) common law fraud with respect to claims about the Mexican survey results;

and (4) a violation of the Lanham Act. *See Lithuanian Commerce Corp.,* 179 F.R.D. at 465–83.

**3.** Throughout this opinion, I will refer to the trial transcript in the same format, by date.

there is nothing in here that says she's going to testify about projections or lost profits.

9/23/98 Tr. at 941–42.

LCC moved for reconsideration of this Court's September 23, 1998, ruling, which excluded the testimony of Ms. Zajanckauskiene. LCC argued that the "testimony by Ms. Zajanckauskiene on lost profits and LCC's financial affairs is within the ambit of the Joint Final Pretrial Order." 10/5/98 Tr. at 1401; LCC's Memorandum of Law in Support of Motion for Reconsideration of court's Order Limiting the Testimony of Laima Zajanckauskiene ("LCC's Memorandum for Reconsideration"), at 3. Further, LCC contended that "[t]he lost business and day-to-day operations referred to in the description of Ms. Zajanckauskiene's testimony encompasses the lost profits and LCC's financial affairs." 10/5/98 Tr. at 1401–02; LCC's Memorandum for Reconsideration, at 4. On October 5, 1998, I ruled from the bench and held that LCC had not raised any overlooked facts or controlling decisions of law to warrant granting a motion for reconsideration, as required by Local Rule of Civil Procedure 7.1(g). *See* 10/5/98 Tr. at 1399–1400. In my bench opinion, I observed:

> In my opinion of June 29, ... I eschewed Mr. Cummiskey's testimony as overly speculative. See *Lithuanian Commerce Corp. v. Sara Lee Hosiery,* 179 F.R.D. 450 at 458–62. Thus, as of June 29, 1998, over two months before this trial commenced, LCC knew that it needed a new witness to testify about damages. Moreover, LCC moved to amend the Joint Final Pretrial Order to include additional documents as exhibits on August 17, 1998, a motion that was granted on August 21, 1998, but it did not seek to amend to add any witnesses to testify about damages.

10/5/98 Tr. at 1405.

After this ruling from the bench, LCC continued with its presentation of witnesses and evidence, concluding on October 15, 1998. Pursuant to the schedule that I established with the parties on October 8, 1998, *see* 10/8/98 Tr. at 2018, Sara Lee filed and briefed its motion for judgment as a matter of law on October 16, 1998, and LCC provided its response on October 20, 1998.

## II. STANDARD FOR GRANTING JUDGMENT AS A MATTER OF LAW

Federal Rule of Civil Procedure 50 provides:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Fed.R.Civ.P. 50(a)(1). Judgment pursuant to Rule 50 should be granted "only if, as a matter of law, 'the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief.'" *Dudley v. South Jersey Metal, Inc.,* 555 F.2d 96, 101 (3d Cir.1977) (quoting *Denneny v. Siegel,* 407 F.2d 433, 439 (3d Cir. 1969)); *see also Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1166 (3d Cir.1993) (holding that the court may only grant judgment as a matter of law if after "viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability"). "[T]he focus of ... [the] inquiry is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly base its verdict." *Villanueva v. Brown,* 103 F.3d 1128, 1133 (3d Cir.1997). "By such direction of the trial the result is saved from the mischance of speculation over legally unfounded claims." *Brady v. Southern R.R. Co.,* 320 U.S. 476, 480, 64 S.Ct. 232, 88 L.Ed. 239 (1943).

"Furthermore, the Court is not free to (1) weigh the evidence, (2) pass on the credibility of witnesses, or (3) substitute its judgment of the facts for that of the jury." *Tripodi v. Johnson & Johnson,* 877 F.Supp. 233, 236 (D.N.J.1995) (Debevoise, J.); *see also Aloe Coal Co. v. Clark Equip. Co.,* 816 F.2d 110, 113 (3d Cir.) (holding that, in considering a motion for judgment as a matter of law, "a

court is not free to weigh the evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury"), *cert. denied,* 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987).

## III. DISCUSSION

### A. Lost Profits

 A substantial portion of Sara Lee's lengthy brief in support of its Rule 50 motion is devoted to the argument that LCC has failed to present sufficient evidence upon which a jury could reasonably assess damages on LCC's counts for breach of express warranty, breach of implied warranties of merchantability and fitness for a particular purpose, breach of contract, common law fraud, tortious interference, and violation of the duty of good faith and fair dealing. Sara Lee also argues that LCC has presented the jury with no methodology to calculate damages. Because I find, for the reasons set forth below, that LCC has not provided sufficient evidence to permit the jury to award compensatory damages without resorting to pure speculation, I will grant Sara Lee's motion for judgment as a matter of law with respect to compensatory damages for these claims.

### 1. Evidence of Lost Profits

LCC attempted to present evidence of lost profits through Zajanckauskiene, LCC's Vice–President, and Vereen Mizelle, who worked for Sara Lee as a Marketing Manager and dealt with LCC at the time that Sara Lee provided LCC with the Mexican-made pantyhose. Mizelle testified that the Mexican-made pantyhose were worth $920,349.20 at wholesale. 9/10/98 Tr. at 393–94. Mizelle also stated that he told Vasys "that the total value to [Vasys of the Mexican-made panty-

hose] would be whatever [Vasys] added on" for retail sale in Lithuania.[4] *Id.* Zajanckauskiene testified that, at retail, LCC sold "Silky Sheer" and "Nylon Classics" styles pantyhose for $2.75 per pair, "Sheer Energy" for $4.75 per pair, and "Sheer Elegance" for $3.50 per pair, which would have produced a total of $1,797,120 in potential gross profits. *See* 9/24/98 Tr. at 1056–62; Pl.'s Ex. 280. She also testified that LCC incurred approximately $50,000 in expenses in 1995, and spent $28,000 to ship the Mexican-made pantyhose from North America to Lithuania. *See* 9/24/98 Tr. at 1061–62; Pl.'s Ex. 280. Additionally, Zajanckauskiene stated that LCC had already earned $35,853 in profit from the Mexican-made pantyhose. *See* 9/24/98 Tr. at 1061, Pl.'s Exs. 115 & 280. Thus, LCC has provided evidence of potential gross profits and of expenses for one year, however, LCC did not produce any evidence about the length of time that it would take LCC to sell all 510,660 pairs of pantyhose.[5]

### 2. A "Reasonable" Degree of Certainty Is Required for Proof of Lost Profits

 "Evidence affording a basis for estimating damages with some reasonable degree of certainty is sufficient to support an award of compensatory damages." *Paolicelli v. Wojciechowski,* 132 N.J.Super. 274, 278–79, 333 A.2d 532 (N.J.Super.App.Div.), *cert. denied,* 68 N.J. 153, 343 A.2d 441 (1975); *see also Viviano v. CBS, Inc.,* 251 N.J.Super. 113, 129, 597 A.2d 543 (N.J.Super.1991); *Westrich v. McBride,* 204 N.J.Super. 550, 557, 499 A.2d 546 (N.J.Super. Law Div.1984) (holding that "damages claimed in a breach of contract action must be reasonable, certain and not speculative"). Similarly, "[l]ost profits may be recoverable if they can be estab-

---

4. In response to a request for an offer of proof on damages from counsel for Sara Lee, LCC's counsel stated that LCC would prove at trial that the Mexican-made pantyhose were worth $324,000 at wholesale and "whatever margin you tack on is what it's worth at retail." 9/8/98 Tr. at 68.

5. Counsel for LCC attempted to elicit this information from Zajanckauskiene, however, because it was outside the scope of the description of her testimony as set forth in the Joint Final Pretrial Order, I sustained Sara Lee's objection to the question, in the following exchange:

BY MR. SAPUTELLI:
Q. Okay. I'm not going to ask you about 1996, but I would like to ask you whether you had an opinion as to how long it would take you to sell 510,000 pairs of Mexican made pantyhose?
MR. HITTINGER: Objection.
THE COURT: Sustained. The jury will disregard the question.
MR. SAPUTELLI: Nothing further. Thank you, Laima.
9/24/98 Tr. at 1066.

lished with a 'reasonable degree of certainty.'" *Perth Amboy Iron Works, Inc. v. American Home Assurance Co.,* 226 N.J.Super. 200, 224, 543 A.2d 1020 (N.J.Super.App.Div.1988) (quoting *Stanley Co. v. Hercules Powder Co.,* 16 N.J. 295, 314, 108 A.2d 616 (1954)), *aff'd,* 118 N.J. 249, 571 A.2d 294 (1990); *see also Viviano,* 251 N.J.Super. at 129, 597 A.2d 543 (holding that "mere uncertainty as to the amount of damages will not preclude a recovery even though proof of the amount of damages is inexact"). "Anticipated profits that are remote, uncertain or speculative, however, are not recoverable." *Id.* Thus, while "[i]t would be a travesty to deny a plaintiff essential justice because the absence of means for precision precludes perfect justice," the factfinder may not engage in "mere speculation." *American Sanitary Sales Co. v. New Jersey,* 178 N.J.Super. 429, 435, 436, 429 A.2d 403 (N.J.Super.App.Div.1981).

 To find damages with sufficient certainty to ensure that the verdict is not based upon pure speculation, "[t]here must always be a reasonably accurate and fair basis for the computation of alleged lost profits." *J.L. Davis & Assocs. v. Heidler,* 263 N.J.Super. 264, 276, 622 A.2d 923 (N.J.Super.App.1993) (quoting *Borbonus v. Daoud,* 34 N.J.Super. 54, 61, 111 A.2d 443 (N.J.Super.Ch. Div. 1955)). To make such a computation, the plaintiff must present the jury with evidence of projected profits, and present and future costs. *See Borough of Fort Lee v. Banque National de Paris,* 311 N.J.Super. 280, 296, 710 A.2d 1 (N.J.Super.App.Div.1998) (" 'Lost profits' signifies the difference between gross income and the costs or expense which had to be expended to produce the income."). Without proof of costs, the factfinder cannot award lost profits without resorting to pure speculation. *See J.L. Davis & Assocs.,* 263 N.J.Super. at 276, 622 A.2d 923; *see also Deaktor v. Fox Grocery Co.,* 475 F.2d 1112, 1116 (3d Cir.1973) ("Plaintiffs' failure to produce evidence concerning the factors essential to establish net profit as opposed to gross profit, in effect, meant that the jury would have had to speculate as to the amount of damages.").

In this case, the trial record contains minimal evidence of profits and costs, and absolutely no evidence regarding a methodology for the computation of damages. To be sure, LCC is not required to provide the jury with an expert on damages, or with mathematically precise evidence regarding the amount of damages it allegedly sustained, because any projection of lost profits is necessarily an estimate. LCC, however, cannot leave the jury to its own devices. Rather, LCC should have, but did not, provide the jury with a means to calculate lost profits that directs the jury to consider, in combination, the following data: (1) the number of pantyhose received from Sara Lee; (2) the price at which these pantyhose would be sold by LCC; (3) the amount of time in which LCC would sell all of these pantyhose; (4) the expenses that LCC would incur in selling the pantyhose over time; and (5) the means to discount, that is, reduce to present value, the profits that LCC would have realized from the sale of those pantyhose in future years.

LCC claims that it could have sold all 510,660 pairs of pantyhose that it received from Sara Lee as part of the July 7, 1995, settlement. *See* LCC's Brief in Opposition to Defendant's Motion for Judgment as a Matter of Law ("LCC's Brief"), at 23; *see also* Pl.'s Ex. 280 (accounting for the receipt of 510,660 pairs of Mexican-made pantyhose). Laima Zajanckauskiene testified that LCC sold 25,521 pairs of pantyhose in 1995 and 22,333 pairs in 1996. *See* 9/15/98 Tr. at 592 (1996 sales), 595 (1995 sales); Pl.'s Ex. 98. Zajanckauskiene also testified that LCC experienced a 500% increase in its client base. 9/14/98 Tr. at 494–96. Even assuming that this five-fold increase in LCC's client base is accurate and fairly corresponds to a like increase in the number of sales, LCC would only have sold, at most, 127,605 pairs of pantyhose in one year. I have calculated this figure by accepting as true the 500% growth rate in sales claimed by LCC and applied it to the more generous 1995 sales figure of 25,521 pairs of pantyhose. The sale of 510,660 pairs of pantyhose in one year would constitute a 2000% increase in growth. None of the evidence presented by LCC supports such a claim. Indeed, a reasonable jury could not possibly find that LCC would have sold 510,660 pairs of pantyhose of any specification in one year, based on the evidence presented at trial.

Thus, LCC had to provide the jury with some evidence or methodology to determine how many years it would have taken LCC to sell this volume of pantyhose, how much LCC's expenses would likely have been during these years, and how to discount to present value the projected profits from sales made in future years. Without these three pieces of information, the jury cannot calculate an award of compensatory damages that is not wholly speculative. *See J.L. Davis & Assocs.*, 263 N.J.Super. at 276, 622 A.2d 923; *see also Borough of Fort Lee v. Banque National de Paris*, 311 N.J.Super. 280, 296, 710 A.2d 1 (N.J.Super.App.Div.1998) (" 'Lost profits' signifies the difference between gross income and the costs or expense which had to be expended to produce the income."). Moreover, since LCC is a new or "start-up" business, it must present sufficient evidence to enable the jury to determine lost profits with "reasonable certainty." *See Perini Corp. v. Greate Bay Hotel & Casino, Inc.*, 129 N.J. 479, 509, 610 A.2d 364 (1992) (holding that "a new business [can recover for lost profits] when they can be proved with reasonable certainty") (citing Robert L. Dunn, *Recovery of Damages for Lost Profits*, § 4.2 (3d ed.1987)).

LCC also contends that "[o]ther methods of calculating damages under the law will be presented to the jury by way of jury charges." LCC's Brief, at 7. This argument is both implausible and insufficient. LCC's proposed jury charge on lost profits provides the following method for calculating damages: "In arriving at the amount of any loss of profits sustained by LCC, you may consider any past earnings of LCC in its business, Sara Lee's projections as to LCC's future sales, as well as other evidence bearing upon the issue." Proposed Jury Charges of Plaintiff Lithuanian Commerce Corp. and Counterclaim Defendants Lithuanian Commerce Corp., Algis Vasys and Laima Zajanckauskiene, submitted Sept. 1, 1998, at 169, Request No. 129. Similarly, the New Jersey Model Jury Charge on lost profits also does not provide any formula or method to calculate lost profits that considers gross profits, expenses, and discounting to present value. *See* New Jersey Model Jury Charges—Civil 6.18.B. (4th ed.1992). Thus, LCC's suggestion that the jury charge will provide a basis upon which the jury can calculate a compensatory damages award is disingenuous.

Furthermore, even if the jury charge did contain an instruction describing a methodology to calculate lost profits, LCC still has failed to provide the jury with any evidence regarding the proper discount rate with respect to future profits, or LCC's expenses for any year other than 1995. Without such information a jury cannot reasonably determine lost profits. A jury charge is not a substitute for evidence.

In its brief in opposition to Sara Lee's Rule 50 motion, LCC discusses at length *Sandler v. Lawn–A–Mat Chemical & Equipment Corp.*, 141 N.J.Super. 437, 358 A.2d 805 (N.J.Super.App.Div.1976), to suggest that the jury may construct its own method for formulating damages if the plaintiff has failed to provide one. In *Sandler*, the trial court had employed a "unique" method in calculating damages, but the New Jersey Superior Court, Appellate Division, concluded that the trial court's determination of the amount of damages was "warranted by the credible evidence in the record." *Id.* at 453, 358 A.2d 805. The factfinder in *Sandler*, by contrast to the jury in this case, had evidence before him from which he could calculate damages, albeit with a "unique," yet "warranted" formula. In this case, even if the jury had a formula to calculate lost profits, the jury still does not have the raw data before it with which to perform such calculations. Without evidence regarding the length of time that LCC would take to sell 510,660 pairs of L'eggs pantyhose, the expenses LCC would incur in making such a large volume of sales during that period of time, and the proper means to reduce future lost profits to present value, the jury cannot calculate compensatory damages without engaging in sheer speculation to reach its verdict.

LCC also cites *Paris of Wayne v. Richard A. Hajjar Agency*, 174 N.J.Super. 310, 416 A.2d 436 (N.J.Super.App.Div.1980), which involved a suit by a clothing manufacturer against a real estate agent over the sale of property not properly zoned for manufacturing. The clothing manufacturer sued the real estate agent for lost profits based on the

contracts that the manufacturer could not complete because he was forced to close his shop when told that manufacturing was not a permitted use of the property. *See id.* at 312, 416 A.2d 436. The trial judge relied solely on the testimony of the plaintiff, who was the owner of the clothing manufacturing business, in awarding compensatory damages. *See id.* at 314, 416 A.2d 436. The plaintiff had provided the court with evidence of: (1) the gross revenues that the manufacturer would have received under four purchase orders already signed and due within the month that the plaintiff had to stop working; (2) the expenses that the plaintiff had already incurred to complete these orders; and (3) the time by which each of the orders was due. *See id.* The defendant challenged the proper measure of damages, arguing that damages should be based on the rent owed on the premises and not lost profits, however, the defendant did not contest whether there was sufficient evidence in the record to compute compensatory damages. *See id.* at 316–17, 416 A.2d 436. Thus, the *Paris of Wayne* case is also inapposite because in this case LCC has failed to provide the jury with critical pieces of information that would enable the jury to calculate such damages.

Finally, LCC expends considerable verbiage discussing the facts and holding in *JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.*, No. Civ. A. 97–652, 1998 WL 175888 (E.D.Pa. Apr.15, 1998). *See* LCC's Brief at 8–10. As noted by Sara Lee in its letter of October 20, 1998, the issues discussed *JMJ Enterprises* arise in the context of a motion for summary judgment. *See JMJ Enters., Inc.*, 1998 WL 175888, at *1; Letter from Carl W. Hittinger, Esq., to the Honorable Stephen M. Orlofsky, dated Oct. 20, 1998, at 1. Because the legal standards used in considering motions for summary judgment differ substantially from those used in deciding a motion for judgment as a matter of law pursuant to Rule 50(a), the holding in *JMJ Enterprises* is inapposite and unhelpful.

At the end of the day, I am compelled to conclude that LCC has simply failed to present sufficient evidence to enable the jury to calculate compensatory damages without engaging in pure speculation.

## B. New Jersey Franchise Practices Act

▇▇▇ As discussed in my opinion of June 29, 1998, *see Lithuanian Commerce Corp. v. Sara Lee*, 179 F.R.D. 450, 470 (D.N.J.1998), the New Jersey Franchise Practices Act ("NJFPA") applies only to a "franchise," *see* N.J. Stat. Ann. § 56:10–4 (West 1989 & Supp.1998), which the statute defines as:

> a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

N.J. Stat. Ann. § 56:10–3a (West 1989). Moreover, the NJFPA applies only to such an arrangement "the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey." *See* N.J. Stat. Ann. § 56:10–4a. Thus, "[a] franchise exists under the NJFPA if: (1) there is a 'community of interest' between the franchisor and the franchisee; (2) the franchisor granted a 'license' to the franchisee; and (3) the parties contemplated that the franchisee would maintain a 'place of business' in New Jersey." *Cooper Distributing Co., Inc. v. Amana Refrigeration, Inc.*, 63 F.3d 262, 268–69 (3d Cir.1995).

Sara Lee has moved for judgment as a matter of law on LCC's claims under the NJFPA, arguing that LCC has failed to prove at least one of these elements. Specifically, Sara Lee contends that LCC has not demonstrated that: (1) LCC had a written agreement; (2) Sara Lee granted LCC a license; (3) LCC and Sara Lee had a community of interest, as represented by franchise-specific investments; and (4) LCC maintained a place of business in New Jersey, as defined by the NJFPA. *See* Sara Lee's Memorandum of Law in Support of its Motion for Judgment as a Matter of Law ("Sara Lee's Memorandum"), filed October 16, 1998, at 44–55. For the reasons that follow, I find that LCC has not presented sufficient evidence from which the jury could reasonably conclude that LCC maintained a place of business in New Jersey within the meaning

of the NJFPA. Accordingly, I will grant Sara Lee's motion on LCC's claims under the NJFPA.[6]

The NJFPA "applies only to a franchise the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey." *See* N.J. Stat. Ann. § 56:10–4a. A "place of business" is defined by the NJFPA as "a fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods" but does not mean "an office, a warehouse, a place of storage, a residence or a vehicle." *See* N.J. Stat. Ann. § 56:10–3f. Thus, "there must be a sales location in New Jersey. Mere distribution through an office or warehouse would not qualify." *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 349, 614 A.2d 124 (1992) (quotation omitted). The statute does not, however, require that any sales actually be consummated at the place of business. *See Cooper Distributing*, 63 F.3d at 274–75.

In this case, the testimony reveals that LCC received mail at its New Jersey office and Mr. Vasys conducted one business meeting with Mr. Zakrevis, president of Latvju Nams, to investigate the possibility of establishing a distributorship arrangement between LCC and Latvju Nams. *See* 9/10/98 Tr. at 301 (testimony of Vereen Mizelle recounting one request from Mr. Vasys that Sara Lee send an order of pantyhose to the New Jersey office, but he did not "recall if it[ was] actually sent to the office"); 9/17/98 Tr. at 834–35. Also, Mr. Vasys testified that he used the New Jersey office to store the Mexican-made pantyhose that he received from Sara Lee. 10/8/98 Tr. at 1915.

Other than those two examples of business activity in New Jersey, Mr. Vasys testified that the office is a house with office supplies, which he repeatedly used for personal use, such as sleeping. *See* 10/8/98 Tr. at 1914–17. Further, Vasys testified that LCC is not authorized to sell pantyhose in New Jersey or anywhere in the United States. *See id.* at 1917. LCC's sales all take "place in Lithuania, Latvia, some in Estonia, [and] Kaliningrad." *Id.* While Vasys testified that he

could have entered into sales contracts in his New Jersey office, *see id.*, he does not mention one instance in which LCC actually consummated a contract that was negotiated or discussed in the New Jersey office. *See id.* Vasys could only recall one occasion in which LCC even discussed the possibility of a sale with a potential customer. *See id.*

In *Cooper*, the Third Circuit held that a "showroom/marketing center" constituted a place of business under the definition in the NJFPA where "[t]here is ample evidence in the record that [the franchisee] *regularly* used th[e] facility for activities that were an *integral* part of the sales process." *Cooper*, 63 F.3d at 274 (emphasis added). In that case, the plaintiff, Cooper, had presented evidence that it had maintained a facility where a "sales manager .... met once a week with customers in [the] showroom" and "three salesmen each used [the] showroom two to four times a week for demonstrations." *Id.* Similarly, in *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 614 A.2d 124 (1992), the New Jersey Supreme Court held that Instructional Systems had demonstrated that it maintained a place of business in New Jersey by presenting evidence that it "ha[d] been giving more than one hundred demonstrations a year" at its New Jersey marketing facility. *Id.* at 348, 351, 614 A.2d 124.

By contrast, LCC has presented evidence that only one person, Mr. Zakrevis, president of Latvju Nams, visited LCC's New Jersey office to view product samples. One instance, as a matter of law, cannot constitute "regular" and "integral" use. LCC simply has not offered sufficient evidence to permit a reasonable jury to conclude that the New Jersey office represented "an integral part of the sales process," *see Cooper*, 63 F.3d at 274, especially considering that LCC was not licensed to sell pantyhose in the State of New Jersey, or authorized to do so by Sara Lee. *See* 10/8/98 Tr. at 1914–17 (testimony of Vasys acknowledging that LCC is not authorized to do business in New Jersey by the State of New Jersey or by Sara Lee).

---

**6.** In light of this conclusion, I need not and do not address Sara Lee's other arguments ad-

vanced in support of its Rule 50 motion on the NJFPA claim.

This evidence demonstrates that LCC's New Jersey office served as "an office, a warehouse, a place of storage, [and] a residence," precisely those locations which the NJFPA defines as *not* constituting a place of business so as to trigger the application of the Act. Thus, LCC has provided no evidence from which a reasonable jury could find that LCC had a place of business in New Jersey. For that reason, I must grant Sara Lee's Rule 50 motion on LCC's NJFPA claim.

### C. Punitive Damages

■ Sara Lee argues that "LCC has presented insufficient evidence upon which a reasonable jury could base an extraordinary award of punitive damages for LCC." Sara Lee's Memorandum, at 76. Regardless of the merit of this contention, Sara Lee misses the more critical point, which is that the New Jersey Punitive Damages Act ("NJPDA") only permits an award of punitive damages "if compensatory damages have been awarded." N.J. Stat. Ann. § 2A:15–5.13.c. (West Supp.1998); *see also* S. 1496, c. 142 (N.J. 1995) (Assembly Insurance Committee Statement) (explaining that part of the purpose of the Punitive Damages Act is to limit awards of punitive damages to cases in which compensatory damages have been awarded).

Enacted in 1995, the NJPDA governs all "causes of action filed on or after" October 27, 1995. 1995 N.J. Laws ch. 142, § 11 (West). LCC filed its Complaint in this case on April 29, 1996 and, therefore, as LCC acknowledges in its brief, the NJPDA governs LCC's claims for punitive damages. *See* LCC's Brief at 72. Thus, unless the jury can award compensatory damages to LCC, LCC cannot recover punitive damages. Because I have found in Section A, *supra*, that LCC has not presented sufficient evidence upon which a reasonable jury could make an award of compensatory damages without engaging in pure speculation, I must conclude as a matter of law that the jury cannot award punitive damages in this case.

Additionally, the NJPDA provides that in determining the amount of an award of punitive damages, "the trier of fact *shall* consider ... [t]he financial condition of the defendant." N.J. Stat. Ann. § 2A:15–5.12 (West Supp.1998) (emphasis added). At no point in the eighteen days of trial and in the more than 2500 pages of trial transcript did LCC ever mention Sara Lee's financial condition. Without any evidence of the wealth of the malfeasant, a jury cannot determine the amount of punitive damages necessary to deter similar conduct.

Finally, the NJPDA requires that "[i]n any action in which there are two or more defendants, an award of punitive damages must be specific as to a defendant, and each defendant is liable only for the amount of the award made against that defendant." N.J. Stat. Ann. § 2A:15–5.13.e. (West Supp.1998); *see also Inter Med. Supplies Ltd. v. EBI Med. Sys., Inc.,* 975 F.Supp. 681, 696–97 (D.N.J.1997) (Orlofsky, J.). LCC has not suggested any means by which the jury could distinguish among the Defendants, Sara Lee Hosiery, Sara Lee Hosiery International, Sara Lee International, and Sara Lee Corporation, in assessing punitive damages.

Accordingly, I must grant Sara Lee's motion for judgment as a matter of law on LCC's claim for punitive damages.

## IV. CONCLUSION

For the reasons set forth above, I will grant Sara Lee's motion for judgment as a matter of law on all of LCC's remaining claims.

### ORDER

This matter having come before the Court on the motion of Defendants and Counterclaim Plaintiffs, Sara Lee Hosiery, Sara Lee Hosiery International, Sara Lee International, and Sara Lee Corporation (collectively "Sara Lee"), for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a), Carl W. Hittinger, Esq., Lance D. Lewis, Esq., and Neil C. Schur, Esq., of Ballard, Spahr, Andrews & Ingersoll, LLP, appearing of behalf of Sara Lee, and Gregory D. Saputelli, Esq., James R. Thompson, Esq., James T. Asali, Esq., and Kimberly D. Sutton, Esq., of Obermayer, Rebmann, Maxwell & Hippel, appearing on behalf of Plaintiff and Counterclaim Defendant, Lithuanian Commerce Corp., and Additional Counterclaim Defendants, Algis Vasys and Laima Zajanckauskiene; and,

The Court having considered the submissions of the parties and the evidence presented at trial;

IT IS HEREBY ORDERED on this 21st day of October, 1998, that the motion of Sara Lee for judgment as a matter of law is GRANTED.